# CERTIFICATION OF FILING OF TRANSCRIPT

As a court reporter in and for Milwaukee County, I do hereby certify that I filed the following transcript of proceedings with the Clerk of Circuit Court, Milwaukee County, Wisconsin, on: (FILE STAMP).

Defendant: **TERRANCE LAVONE EGERSON**

Case No.: 15-CF-001075

Proceeding: Sentencing Hearing

Date Held: April 28, 2016

**FILED**
**CRIMINAL DIVISION**

JUN 07 2016

36            36

JOHN BARRETT
CLERK OF CIRCUIT COURT

Copy Provided To:

Institution

FILED CRIMINAL DIVISION
2016 JUN -7 PM 4:52
CLERK OF CIRCUIT COURT

Submitted By: William J. Carpenter
Court Reporter, Branch 47

 **ORIGINAL**

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY
BRANCH 36

---

STATE OF WISCONSIN,          Case No.:  15-CF-001075

PLAINTIFF,

   vs.

TERRANCE LAVONE EGERSON,

DEFENDANT.

---

SENTENCING HEARING

---

April 28, 2016

> PROCEEDINGS HELD BEFORE THE
> HONORABLE JEFFREY A. KREMERS
> COURT COMMISSIONER, PRESIDING

A P P E A R A N C E S:

MILWAUKEE COUNTY DISTRICT ATTORNEY'S OFFICE by Assistant District Attorney Nicolas J. Heitman, 821 West State Street, 4th Floor, Room 405, Milwaukee, Wisconsin, 53233, appeared on behalf of the plaintiff.

GARY E. ROSENTHAL LAW OFFICE by Attorney Gary E. Rosenthal, 207 East Buffalo Street, Suite 606, Milwaukee, Wisconsin, 53202, appeared on behalf of the defendant.

TERRANCE LAVONE EGERSON, Defendant, appeared in person in custody.

> William J. Carpenter
> Court Reporter

FILED
2016 JUN -7 PM 4:52
CLERK OF CIRCUIT COURT
CRIMINAL DIVISION

**TRANSCRIPT OF PROCEEDINGS**

2              (Whereupon, the following proceedings

3       commenced at 3:37 o'clock in the afternoon.)

4              THE COURT:  The State of Wisconsin

5       versus Terrance Egerson, 15-CF-001075.

6              Appearances, please?

7              MR. HEITMAN:  Nick Heitman for the

8       State.  Good afternoon.

9              MR. ROSENTHAL:  Gary Rosenthal

10      appears with Mr. Egerson.

11             Mr. Egerson appears personally.

12             THE COURT:  Good afternoon.  We're

13      here for sentencing.

14             The defendant was convicted of five

15      counts of violating a domestic abuse injunction and

16      one count of stalking as a result of a jury trial.

17             The first thing we need to do is to

18      address the basis for the habitual criminality

19      repeater and the domestic abuse repeater.  The

20      domestic abuse repeater, I think, was actually taken

21      care of by the jury verdicts.

22             But just to make sure that we're

23      clear on this, Mr. Rosenthal, does your client

24      challenge the fact that he -- at all -- challenge

25      the fact that he was convicted of a felony in the

```
 1        last five years?

 2                    MR. ROSENTHAL:  I do want to check.

 3                    (Whereupon, counsel confer

 4        privately.)

 5                    MR. HEITMAN:  I've provided

 6        Mr. Rosenthal with the chance to review the

 7        certified transcript, Judge, from Mr. Egerson's

 8        sentencing from 2014, in November, indicating that

 9        he had been convicted of one count of felony bail

10        jumping.

11                    I'm going to ask to show that to the

12        Court.

13                    (Whereupon, the document is presented

14        to the Court for review.)

15                    THE COURT:  So you're challenging the

16        fact that he was convicted of a felony within the

17        last five years?

18                    MR. ROSENTHAL:  That is correct, Your

19        Honor.

20                    THE COURT:  That he's not

21        challenging?

22                    MR. ROSENTHAL:  Not challenging.

23                    THE COURT:  Is that correct,

24        Mr. Egerson?

25                    THE DEFENDANT:  Yes, sir.
```

4

```
 1                    THE COURT:  All right.  And then also

 2         with respect to the domestic violence -- or domestic

 3         abuse repeater, even though I think that's been

 4         addressed, your client was -- your client also

 5         agrees that he was convicted of, at least on two

 6         separate occasions, a felony or a misdemeanor of

 7         domestic violence within the last ten years?

 8                    MR. ROSENTHAL:  I believe that with

 9         judgments of conviction that Mr. Heitman has filed,

10         it does show the DV surcharges or assessments for

11         multiple offenses.

12                    THE COURT:  Okay.  All right.  So, I

13         will enter judgments of conviction then for the six

14         counts that we talked about, and each of the counts

15         will reflect that they're as a habitual criminal and

16         as a domestic abuse repeater;

17                    Which, according to my calculations

18         then, the defendant is facing a maximum possible

19         penalty of four years and nine months on each of the

20         five violation of a domestic abuse injunction cases

21         and twelve years on the stalking charge.

22                    MR. HEITMAN:  Judge, I believe the

23         jury verdicts that were rendered indicated they were

24         not crimes of domestic abuse.

25                    THE COURT:  Well, one of them wasn't.
```

5

```
1                        MR. ROSENTHAL:  Two.

2                        MR. HEITMAN:  Two.

3                        THE COURT:  Two of them.

4                        MR. HEITMAN:  The first two counts of

5      violation of a domestic abuse injunction were not as

6      a DV repeater, Judge.

7                  .     THE COURT:  So those cases, there

8      would be a --

9                        MR. HEITMAN:  Two years.

10                       THE COURT:  Two years, just two

11     years.

12                       MR. HEITMAN:  Two years.

13                       THE COURT:  All right.  So on two of

14     the counts, Counts -- I guess I will have to look at

15     the verdicts to make sure they're the right ones.

16                       (Whereupon, the Court reviews the

17     file.)

18                       THE COURT:  Counts One and Three, the

19     rest of them were.  So, Count One, the maximum

20     possible penalty is two years;

21                       Count Two, the maximum possible

22     penalty is twelve years;

23                       Count Three, two years; and

24                       On the remaining three counts, four

25     years and nine months.
```

6

```
1                    Is that correct, Mr. Heitman?

2                    MR. HEITMAN:  Yes.

3                    THE COURT:  Mr. Rosenthal, do you

4        agree with that?

5                    MR. ROSENTHAL:  Yes.

6                    THE COURT:  Okay.  All right.  I'll

7        hear first from the State and then from the Defense.

8                    MR. HEITMAN:  Judge, Ms. Egerson is

9        present and wishes to address the Court.

10                   THE COURT:  All right.  She can.

11                   (Whereupon, Ms. Alexandra Egerson

12       enters the courtroom and is seated at the State's

13       table.)

14                   THE COURT:  Your name, please?

15                   MS. ALEXANDRA EGERSON:  Alex Egerson.

16                   THE COURT:  And what would you like

17       to tell me?

18                   MS. ALEXANDRA EGERSON:  I have

19       thought long and hard about everything that I want

20       to say today.  There is so much to say, but I found

21       the right words would not be easy to say.

22                   Being married to Terrance was a

23       roller coaster.  You never knew what you were going

24       to wake up to.  One day you might have breakfast in

25       bed with roses upon the nightstand; another day, you
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 7 of 63   Document 13-27

68-7

```
 1        might wake up with him yelling at you, cussing you

 2        out, complaining about everything in the house.

 3                        Obviously, the good days had the

 4        potential to be great days, fantastic times.  But on

 5        the other hand, those bad days that I've gone

 6        through, Terry has damaged me in a way that I'm not

 7        certain is repairable.

 8                        All of my physical injuries have

 9        healed.  Those are the easy injuries.  The real

10        damage, the real damage, is the mental, the

11        emotional.

12                        I'm a person who is officially

13        diagnosed with PTSD.  I am doing my part to fix the

14        damages, but it's not something that is easy to

15        cure.

16                        The talking and stalking, the

17        consistent observation, the phone calls, the

18        pop-ups, they're always in your thought process

19        going forward, the uncertainty of who to talk to,

20        the uncertainty of who to trust, who's relaying

21        information to him.  It's stressing.

22                        I was fortunate enough that I found a

23        circle, and I have added a few friends, and I keep

24        being strong, keeping going.

25                        Even though I have them, there was a
```

8

1  point that I had to ostracize myself for the sake of

2  them.  He was relentless.

3                    He called my mom, my sisters, my

4  cousins, my friends, my dad in the middle of the

5  night, repeatedly.

6                    He would show up at my father's

7  house, at my mother's house, following me sometimes

8  going to work, going to family's, called my

9  landlord, called my boss, even called my mom's shop.

10                    He was consistently monitoring me to

11  a point where it was dangerous for them.  It was

12  unfair to them.  I would be the one that he would

13  harass on the phone.  The relationship ended.

14                    I had many days I felt guilty.  All

15  of this was happening because I was ending this, and

16  they were associating with me, and I just wanted

17  peace.

18                    The whole ordeal of being married to

19  him, leaving him, has definitely affected our

20  lifestyle.  Financially, I've had to adjust for

21  caring for three small children on my income.

22                    But now their responsibility is on me

23  at all times.  There are no breaks.  I'm always on

24  mommy mode.  I go to work, take a break, leave them

25  at nanny's, take calls from school, that's all on

9

1    me.
2              Whatever they need is on me to make
3    sure they get it.  The mental, emotional damage from
4    their father is something that I have to repair.  I
5    have to explain that to them.  I have to help them
6    through and watch them hurt.
7              So I have to set aside my own hurt
8    and constantly pick up their pieces, and make sure
9    they can count on me.  It has taken me three or four
10   years, but we finally found it.  They have found it
11   in their new life, they were strong.
12             There will always be a void because
13   they don't have an active father, but I make sure
14   they know that that was their father's choice, not
15   any fault of theirs.
16             It affects my older son the most, he
17   remembers him.  He remembers the good times, but he
18   also remembers the bad times.
19             He has been taking therapy to get his
20   anger under control.  Although he is not diagnosed
21   with PTSD, the therapist has made it very clear that
22   he definitely has all the symptoms.
23             He's doing much better now, but it
24   has taken almost three years of therapy to get him
25   to the point where he's finally happy, and he's

                              10

1   finally on the threshold of finding his way.

2                    With Terry being in prison, my

3   children and I finally have had some peace.  My life

4   is somewhat relaxed.  I'm not looking over my

5   shoulder.  My kids can go outside, and they can

6   enjoying having a somewhat normal life.

7                    Me having less stress, I can play

8   with them more, and move into a new life and laugh

9   and breathe.  Now that this is finishing, I can let

10  all of this settle.  I can move forward with life.

11                   I am doing everything in my power to

12  get my kids disability and a solid foundation that

13  they can live and have a happy childhood with less

14  anger.

15                   In my opinion, I think that Terry

16  should get, at least, ten years in custody.  I have

17  already lost years of my life for fighting with him

18  just to be left alone.

19                   I don't want him in my life.  My

20  children, you know, will grow up fast.  I want to be

21  able to totally enjoy the time I have left with them

22  being so small.

23                   So in addition to the time in

24  custody, I believe that a no-contact order should be

25  part of any sentence, and it should include my

```
1        children.  Otherwise, we will continue to have the

2        battle of Terry using the kids to get to me.

3                        I think it's only fair that we

4        finally have some peace after dealing with all of

5        this over the past five years.  And the only way he

6        can leave me alone is when he's in custody, and he's

7        not allowed to speak with me.

8                        THE COURT:  How old are your

9        children?

10                       MS. ALICE EGERSON:  They are five,

11       six, and eight.

12                       THE COURT:  Thank you very much.

13       Mr. Heitman.

14                       MR. HEITMAN:  Judge, I agree with

15       much of what Ms. Egerson had to say.  I think it's

16       important to note that she indicated that the mental

17       abuse that she has suffered at the hands of

18       Mr. Egerson was more detrimental, in her words, than

19       a lot of physical abuse.

20                       And I think that's very important.

21       Because in November of 2014, the last time

22       Mr. Egerson was sentenced, that's exactly what

23       Judge Flanagan said.  And the Court could actually

24       go to the sentencing transcript.

25                       She indicated that, it says
```

12

1      Mr. Egerson indicates I never put a hand on her.  I
2      never touched her during this time period.  But
3      those cases, there's also the time period of the
4      stalking case.
5                    But he was -- He was told.  It has a
6      cost.  The emotional and mental abuse has a cost,
7      and it doesn't go without affecting Ms. Egerson.
8                    And despite that, Judge, despite a
9      very significant sentence being placed on
10     Mr. Egerson at that point, despite the fact that a
11     valid domestic abuse injunction was in place, it
12     continued.
13                   And that is very, very troubling.
14     And I think, Judge, that is a huge pattern that we
15     see here with the defendant.  The Court can look at
16     the Criminal Complaint in this case.
17                   In 2011, he allegedly battered
18     Ms. Egerson, and he pled guilty to a disorderly
19     conduct.  He then violated a no-contact order while
20     out on bail in that case and was arrested inside of
21     her home violation of court orders.
22                   And then at some point, Judge, after
23     being convicted of both of those offenses, a
24     domestic abuse injunction is sought and received.
25     He violates that continuously, as detailed in the

13

```
1    Criminal Complaint.

2              He is then placed in custody.  While

3    in custody, Judge, he makes those phone calls in

4    violation of the domestic abuse injunction, and many

5    of which, a lot of which, I believe are designed to

6    attempt to dissuade Ms. Egerson from coming to

7    court.

8              And whether or not he said those

9    exact words, Judge, any time a person you share

10   children with, in my opinion, calls you, after

11   victimizing you, from custody, it's going to have

12   that type of effect.  It's saying I'm still here.  I

13   love you.  It makes it difficult for the victim of a

14   crime to follow through with the process.

15             Secondly, I don't know if it's

16   secondly or thirdly, Judge, the defendant doesn't

17   stop.  Restrictions are placed on him.  His phone

18   privileges are taken away, then he violates that,

19   Judge, by abusing the attorney-only phone,

20   contacting Ms. Egerson.

21             And then, eventually, Judge, he

22   pleads guilty to those offenses and is sentenced.

23   While in prison, Judge, he writes these letters.

24   Some of which --

25             And according to the jury, the first
```

14

```
 1        two were not acts of domestic abuse; but, obviously,

 2        violations of an injunction that was in place, a

 3        court order that said --

 4                         And, again, after being sentenced,

 5        after being given, like, ten years for doing

 6        abusive -- for committing abusive conduct, he

 7        continues to violate court orders which is just to

 8        me really astounding, I guess.

 9                         And then the last gets clearly

10        abusive where he writes and I -- the Criminal

11        Complaint:  The plot, the plot thickens.  Lies,

12        liars, words to that effect, Judge, clearly are

13        going to have a significant impact on Ms. Egerson.

14                         And then there's the conduct, I

15        think, Judge, during the trial where Mr. Egerson

16        takes the witness stand and tells this jury I did

17        not write those letters.  My cell mate wrote those

18        letters.  I believe he said without any input from

19        me directing my cell mate to write those letters.

20        He did it on his own after I told him any

21        information he would have needed to know to put in

22        those letters.

23                         I think that, again, is just

24        astounding and almost like not just denying it, but

25        being in denial.
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 15 of 63   Document 13-27

68-15

```
1              And then, Judge, I asked Investigator

2      Linden, who testified in this case, to monitor

3      Mr. Egerson's jail calls while he was here for this

4      current trial.

5              And, Judge, on, I believe

6      May 31 -- or March 31, Judge -- I think we had a

7      Monday trial -- that following Monday, Mr. Egerson

8      makes a phone call to somebody.  It's his pin.  It's

9      his voice which -- and I forwarded this to Defense

10     Counsel -- basically tells that person to get in

11     touch with Ms. Egerson and telling her to drop it.

12     Let me go.  Leave it alone.

13              And I just couldn't -- Obviously, I

14     could believe it, Judge, because of the history.

15     But she had come -- She had participated in the last

16     proceeding, and then we hear this phone call where

17     he says tell her to -- asking her nine years, it's

18     words to that effect, and tell her just to drop it.

19              And it was just, in my opinion again,

20     a clear attempt to dissuade Ms. Egerson from

21     participating in the process.

22              And, again, it's not going to be a

23     criminal charge, Judge.  I am asking the Court to

24     consider that.  I forwarded the call to

25     Mr. Rosenthal.  I'm not going to play it for the
```

16

1      Court.  It is about thirty seconds.

2                        But I think it's just another, just

3      completely, ridiculous.  And I think it's the best

4      adjective, Judge, but the rules don't apply to

5      Mr. Egerson at all no matter what.

6                        But I think his character, Judge --

7      The three things the Court considers:  Gravity of

8      the offense, character, and the need to protect the

9      public -- I think there is a need to protect

10     Ms. Egerson significantly from mental abuse,

11     physical abuse.

12                       I think there -- The gravity of the

13     specific offenses before the Court, the stalking is

14     certainly significant.  It's for years.  And I know

15     the period between some of these events, Judge, like

16     Ms. Egerson said, they -- There were happy times

17     probably between 2011 and today's date, great times.

18                       There's no doubt in my mind that

19     that's a hundred percent true, but the abuse

20     continued anyway.  So, the stalking is, obviously,

21     the most significant of these offenses.

22                       The letters, all very harmful, I

23     think mentally, especially the last three.  I think

24     the most significant thing is that that's the

25     continued violation of court orders, Judge, that

17

```
 1    were in place.

 2                    Which I think brings us to

 3    Mr. Egerson's character which is, the Court can look

 4    at his criminal convictions.  He now has six, eight,

 5    plus six -- I believe nineteen domestic abuse

 6    convictions since 2011, something like that.

 7                    There's maybe not nineteen.  Excuse

 8    me.  Six here, six in the last, that's twelve.  And

 9    then two from 2011.  So fourteen -- Excuse me --

10    fourteen criminal convictions since 2011, not all

11    with a domestic abuse surcharge, but all stemming

12    from incidents of domestic abuse.

13                    So what I'm going to ask the Court to

14    do is on each of the violations of a domestic abuse

15    injunction, one in, one out, consecutive to each

16    other, but concurrent to the sentence that he's

17    currently serving.

18                    The reason I say that, Judge, is that

19    I'm going to ask the Court to impose a no-contact

20    order during the period of in custody.

21                    There is a question of whether there

22    was a no-contact order in place during his current

23    sentence that he's currently serving, and I want to

24    make sure, Judge, that if he violates the contact,

25    not only is he going to be violating the domestic
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 18 of 63   Document 13-27

68-18

abuse injunction that's in place, but this Court has

an order in place from this case that says

Mr. Egerson can't contact Ms. Egerson.

So not only is he violating the

injunction, he's going to be violating the court

order from this sentence while he's in custody.

So one in, one out on each of those,

consecutive to each other, but concurrent to the

sentence he's currently serving.

And then I think that the Court can

do four and four on the stalking, consecutive to all

other sentences.

So I think that would be nine in,

nine out, with the first five in, five out being

concurrent.

I think that's an appropriate

sentence. I think it takes the facts into

consideration, the gravity of this particular

offense, like I said, the need to protect the

public, but most of all, the very significant

character that Mr. Egerson has shown, or lack

thereof, I guess, over this period of time, Judge.

Thank you.

Oh, with, and, obviously, with those

conditions that he have absolutely no contact with

```
 1        Ms. Egerson.  I believe she doesn't want him to have

 2        contact with the children either.

 3                    I don't know if the Court can order

 4        that, but I certainly believe as long as the

 5        children are in Ms. Egerson's custody, any contact

 6        directed at her, her residence would be in violation

 7        of that order.

 8                    So I think, hopefully, if the Court

 9        does follow my recommendation and puts that order in

10        place, that would take care of that issue, Judge.

11                    THE COURT:  Mr. Rosenthal.

12                    MR. ROSENTHAL:  Your Honor, I will

13        advise the Court that Mr. Egerson has family members

14        in the courtroom, and they have asked to address the

15        Court.

16                    I explained to them that the Court

17        could indicate that if they wanted to address the

18        Court, it should be done by a letter to the Court

19        filed prior to today.

20                    Mr. Egerson's mother has done that

21        and --

22                    THE COURT:  I've seen her letter and

23        read it.  I've seen the letter from Mr. Egerson as

24        well and read that.

25                    MR. ROSENTHAL:  I am asking, though,
```

20

| 1 | that the Court can allow a very brief statement from |
| 2 | family members who were not in communication with my |
| 3 | office.  I have not received any notice of them |
| 4 | being here.  They have a desire to make a statement |
| 5 | to the Court, and I think they can be restricted to |
| 6 | a brief two minutes from each of them. |
| 7 | THE COURT:  All right. |
| 8 | (Whereupon, Mr. Cornelius Robinson |
| 9 | enters the courtroom.) |
| 10 | THE COURT: Your name, please. |
| 11 | MR. CORNELIUS ROBINSON:  Cornelius |
| 12 | Robinson. |
| 13 | THE COURT:  Can you spell the first |
| 14 | name? |
| 15 | MR. CORNELIUS ROBINSON: |
| 16 | C-O-R-N-E-L-I-U-S. |
| 17 | THE COURT:  And the last name? |
| 18 | MR. CORNELIUS ROBINSON: |
| 19 | R-O-B-I-N-S-O-N. |
| 20 | THE COURT:  What would you like to |
| 21 | tell me, Mr. Robinson? |
| 22 | MR. CORNELIUS ROBINSON:  Well, Your |
| 23 | Honor, I'm a good friend of Terry Egerson.  I've |
| 24 | known him for forty years now.  We went to high |
| 25 | school together. |

21

He's a good person, a God-fearing man who loves his kids dearly. I remember him -- I recall Terry getting out of jail about twenty years ago and totally turn his life around.

I told him -- He's got a record. I've never seen nobody -- I have never seen a felon -- get out of jail and then in time make about a hundred thousand dollars a year.

I have seen him provide for his kids. I have seen him move on, move his wife and kids into a new construction house that was well over $260,000.

And, you know, one of his biggest downfalls sometimes is just, you know, he's a little hardheaded. He loves his kids. And I told him, no contact is no contact. I realize that.

But I don't -- You know, it just, you know, I think it doesn't seem to fit the crime. I mean, liking the kids, to lock him up, it just don't seem right.

I recall on many occasions when I would go by his house and him and -- he and his wife sitting on the couch watching TV. And I would say to him: What is she doing here? I mean, there's a no-contact order. What's going on?

```
 1                    It just seemed like it was -- I mean,
 2      if it was somebody who has been traumatized and
 3      going through all of this, why would she go over
 4      there?  He's not over there seeing her.  Why would
 5      she be over here in your place, in your house?
 6                    And I would tell him this over and
 7      over again, this is going to bite you in the butt.
 8      But it just seemed like it was, you know, convenient
 9      for her to spend time with him.
10                    To be there with him, it was okay.
11      But if it was an argument or something like that, it
12      was -- She was over there on the side.  But I would
13      remind him of that over and over again that this is
14      going to bite you in the butt.
15                    But for someone to be that
16      traumatized and -- I mean, this guy has went through
17      a lot in the last couple of weeks.  His son, his
18      first child, just died two weeks ago.  He was
19      cremated.
20                    He lost his house.  He's been in
21      jail.  He lost his family.  This guy has gone
22      through so much.  And now, I sit here and hear his
23      wife say that she don't even want the kids to see
24      him.
25                    The kids have a grandmother sitting
```

23

1   right over here, what about her seeing them?  It

2   doesn't make any sense to me.

3               So I just wanted to -- That's all I

4   wanted to add, Your Honor.

5               THE COURT:  All right.  Thank you.

6               (Whereupon, Mr. Cornelius Robinson

7   leaves the courtroom and Mr. Delbert Toles enters.)

8               THE COURT: State your name please.

9               MR. DELBERT TOLES:  Delbert Toles.

10              THE COURT:  Spell the first name.

11              MR. DELBERT TOLES:  D-E-L-B-E-R-T;

12  last name, T-O-L-E-S.

13              THE COURT:  What would you like to

14  tell me, Mr. Toles?

15              MR. DELBERT TOLES:  I'm a cousin of

16  Terry.  I've been knowing him all his life.

17  Terry -- Terry has been through some drama early on

18  in life, and some of this behavior probably stems

19  from that.

20              He witnessed his father being killed

21  due to domestic violence.  And this probably has had

22  a long-lasting effect on him.

23              Like Cornelius said, Terry is a good

24  person.  But, as you know, these moments of his, his

25  wife still do come by and see him after the

24

1

2

restraining order, but they do it at their

convenience.

And if it's convenient for them,

there's no restraining order out; but if it's not,

they call the police.  And this, I'm sure, has a lot

of mental effect on a person.  You don't know, are

you good with this person, or are you not.

And this -- This is a pattern that's

been going on for quite some time.  And I'm -- I

didn't expect to see that.  But I think being

traumatized early on, and then traumatized by his

woman, and then telling him that he can't see his

kids, or the no-contact order with the kids, it's

one thing to say not to see his wife, but to take

his children away from him, not to see his children,

I don't think he harmed, never harmed his kids.

By and large, Terry is good person,

not a violent person.  Not a person that deserves

those many years in jail.  I've seen people who did

a lot worse and sit in jail a lot less.  But sitting

in jail that long seems unfair.

THE COURT:  Okay.  Thank you.  All

right. Mr. Rosenthal.

MR. ROSENTHAL:  Thank you very much.

Your Honor, as many cases that we've seen in DV

```
1        court, as many cases as Mr. Heitman and I have seen

2        in DV court, Mr. Egerson doesn't present himself,

3        represent himself, as the typical defendant that

4        comes into your court.

5                        There are no acts of physical

6        violence that are before the Court in these matters.

7        There are allegations of the emotional costs,

8        emotional abuse.

9                        And I'm not trying to limit or

10       indicate that that isn't something of significant

11       consideration to the Court, I'm not trying to

12       indicate to the Court that that isn't something that

13       the jury has spoken to.

14                        A jury has made its findings, there

15       have been convictions, and Mr. Egerson has to be

16       punished for them.  But I think the Court needs to

17       look at the nature of the contacts and

18       communications between Mr. Egerson and Ms. Egerson.

19                        The other difference I've

20       seen -- We've spoken briefly -- that Mr. Egerson

21       came out of custody for a sentence, a lengthy period

22       of time ago, turned his life around appreciably,

23       worked for himself with a business venture.

24                        He had a number of employees, worked

25       for Motorola, and was able to, in the teens, amass
```

income that went anywhere between a hundred thousand
and two hundred-plus thousand dollars a year.

He was able to provide for his family
a lifestyle that allowed him to live comfortably in
a nice home, with nice vehicles, and enabled them to
have the physical things that many families don't
have.

And it shows that Mr. Egerson was
able to move beyond criminal conduct, become a
productive member of the community, generate
appreciable income, and provide for a family.

Ms. Egerson's testimony in the direct
testimony, the State's part of the case, showed a
duality that she has, her statements today to the
Court at sentencing, all of the positives and then
mention the negatives that came with it.

I think that it's typical of all
relationships to see that. But I think in this
case, we saw the extremes. The good times were
really good times. There some times Ms. Egerson
categorized as a roller coaster. It wasn't just a
little bump up. It was a very, very, very good bump
up, a very, very good time.

The bad times were to her -- She's
talked to the court today -- just as bad. She's

27

```
 1        indicated that Mr. Egerson's personality could be

 2        very different from the one day to the next.

 3                    And I don't dispute that there is an

 4        emotional cost, that there was emotional abuse that

 5        occurred, but I ask the Court to look into the

 6        nature of the relationship that the two had

 7        together.

 8                    I did direct -- I did elicit in

 9        cross-examination the confirmation that the parties,

10        while the domestic violence abuse injunction was in

11        effect, lived together; that Ms. Egerson spent time

12        with Mr. Egerson; that there were visits to his

13        house.   There were phone calls.

14                    I understand the nature of an abusive

15        relationship.   I understand that the -- what they

16        call an abused party, or victim, or whatever we use

17        to define that, may very well come back into that

18        relationship and engage in contact where it's

19        natural contact.

20                    But it also winds wind up -- And I

21        want to be careful how I use the word "manipulates."

22        I don't mean an intentional manipulation by

23        Ms. Egerson, but it may create emotions in

24        Mr. Egerson to have further and additional contact.

25                    He know there's an injunction out
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 28 of 63   Document 13-27

68-28

1  there.  He knows that he's not supposed to have
2  contact.  He knows that he puts himself in peril.
3          He also knows that Ms. Egerson has
4  every right in the world to contact him, the
5  injunction doesn't run in both directions.  And he
6  doesn't think that that injunction is even valid,
7  and he doesn't.  And he violates it, and he has
8  contact with her.
9          I would just indicate to the Court
10  that I think we have to look differently at this.
11  If Mr. Egerson was the initiator of all contacts, if
12  he continued to foist himself on Ms. Egerson,
13  continued there with the contact, I think that it
14  would be a different situation than the contact that
15  occurred here.
16          I think that it flowed both ways.  I
17  don't question that Mr. Egerson had contact with
18  Ms. Egerson.  I don't question that he initiated
19  some of the contact.
20          But I also know from the questioning
21  her, the testimony of Ms. Egerson at the trial, that
22  a significant amount of the contact was initiated by
23  her.
24          And we think that it's a fact that
25  the Court should look at and should consider in the

29

1    determination of sentencing.

2                I know that the Court has the

3    presentence report from the matters before Judge

4    Flanagan.  It has the State's generated report.  It

5    has a private presentence.

6                I'm assuming the Court read it, and

7    I'm assuming the Court would accept the information,

8    and it's being valid.  But Mr. Egerson did indicate

9    to me that the federal charge that was set forth in

10   the presentence investigation prepared by the State

11   was not correct.

12               It was a money laundering charge.

13   Mr. Egerson indicated that the actual charge was

14   unauthorized use or the access to monies.  It was a

15   credit card fraud.

16               I mention that because the money

17   laundering connotation can be misconstrued if I let

18   the Court -- if I let that stand, that that was what

19   the offense was; particularly, since one of the

20   things I've commented on is the significant income

21   that Mr. Egerson has generated and has money coming

22   from somewhere and retained a portion of it as he

23   generated his income.

24               So I just need to indicate to the

25   Court what that would have been, basically, an

```
 1          identity fraud case.

 2                    THE COURT:  Now -- Well, two things.

 3          Is that the only, that information about the federal

 4          charge, the only inaccurate thing in the prior

 5          presentence report?

 6                    MR. ROSENTHAL:  Let me ask

 7          Mr. Egerson that.

 8                    THE COURT:  Sure.

 9                    (Whereupon, Mr. Rosenthal confers

10          privately with his client.)

11                    MR. ROSENTHAL:  Mr. Egerson indicated

12          that the report provided to him, he was not eligible

13          for PRP and --

14                    THE COURT:  Okay.  That's not really

15          a factual background, factual information.  But as

16          to the factual information, if I were to either

17          ignore the federal reference, the reference to the

18          federal charge altogether, or worse case from you

19          client's perspective, consider it only in the vein

20          as you've just described it, is the rest of the

21          factual information in here accurate, in terms of

22          your background and all of that?

23                    THE DEFENDANT:  I would -- I would

24          have to look at it again, Your Honor.  I

25          can't -- You know I just walked in here.  I mean,
```

31

```
 1          they just picked up and --

 2                      THE COURT:  I, you know, I frankly

 3          don't feel the need to consider what's in the prior

 4          presentence report in terms of making a

 5          determination of what to do in this case other than

 6          his prior criminal record, taking out for purposes

 7          of this hearing, any reference to the federal

 8          laundering.

 9                      And, quite frankly, to be honest with

10          you, I looked at the chart of his convictions, and

11          the chart of his convictions are only State

12          convictions.  It doesn't mention the federal charge.

13                      There is a sentence or two at the end

14          of the chart, outside of the chart, that talks about

15          the federal thing.  But, frankly, I didn't even

16          consider that in my -- the only --

17                      Because everybody, the last time we

18          were here, and Mr. Heitman referenced this

19          presentence report, and Mr. Egerson made some

20          comment about it not being accurate, so for purposes

21          of today, I only really have looked at his prior

22          record, and I'm just prepared to go forward on that

23          basis.

24                      For example, I know there's a COMPAS

25          evaluation in here.  I didn't even look at that.
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 32 of 63   Document 13-27

68-32

```
 1        Because, frankly, I think if you were going to do, I

 2        think you would almost have to be re-tested for the

 3        COMPAS evaluation.  And so I didn't consider that,

 4        and I'm not considering that unless people want me

 5        to.

 6                        MR. ROSENTHAL:  That's fine, Judge.

 7                        THE COURT:  All right.  So other than

 8        that, let's be more specific then, Mr. Egerson.

 9        Your criminal record which is listed in the chart

10        for me list:

11                        A 1987 battery, reckless use of a

12        weapon;

13                        '87, manufacture and delivery of

14        cocaine;

15                        '89, fleeing an officer; '89

16        possession of controlled substance and resisting an

17        officer;

18                        From '90, disorderly conduct;

19                        '91, two counts of forgery;

20                        '93, criminal damage to property;

21                        '94, resisting an officer;

22                        2000, theft and criminal damage to

23        property;

24                        2004, resisting or obstructing an

25        officer;
```

33

```
 1                    2006, disorderly conduct;

 2                    2011, disorderly conduct, domestic

 3       abuse related;

 4                    2011, bail jumping, misdemeanor,

 5       domestic abuse related; and then

 6                    The six counts that are not listed on

 7       this chart but that were resolved in front of Judge

 8       Flanagan that involved one count of violating

 9       domestic abuse injunction, domestic abuse related;

10       one count of intentionally violating a no-contact

11       order after a misdemeanor conviction; one felony

12       bail jumping, domestic abuse related; one

13       intimidating a witness, domestic abuse related; and

14       one bail jumping; another bail jumping, felony bail

15       jumping, domestic abuse related; and then, lastly, a

16       domestic abuse -- violating a domestic abuse order.

17       Those are the convictions from Judge Flanagan in

18       2014.

19                    So, that's the criminal record, your

20       criminal record, that I'm considering here unless

21       you tell me something in that list I just read off

22       is inaccurate.

23                    MR. HEITMAN:  That would be accurate,

24       Your Honor.

25                    THE COURT:  All right.  Thank you.
```

34

```
 1          Go ahead, Mr. Rosenthal.

 2                    MR. ROSENTHAL:  Thank you, Your

 3          Honor.  As indicated to the Court previously,

 4          Mr. Egerson involved himself in a lengthy period of

 5          employment.  He has not been under-employed.  He has

 6          not been unemployed.

 7                    He had his own business Info-Tech

 8          Solutions.  That was the reference I made to

 9          generating income routinely from a hundred thousand

10          to a two hundred-plus thousand level.

11                    He also worked for Motorola.  That

12          was his last employer prior to being taken into

13          custody.  He was a tech recruiter for them.  He

14          generated appreciable income, just under the one

15          hundred thousand dollar level.

16                    I would indicate to the Court that in

17          going over the record, a substantial portion of that

18          record is rather dated.  There is the significant

19          convictions that he's currently incarcerated on, but

20          then we have a clear gap between a number of the

21          other convictions.

22                    Mr. Egerson has availed himself of

23          programing at New Lisbon.  At New Lisbon, he has

24          been involved in DV classes there.  He's previously

25          availed himself from classes form the ALMA Center.
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 35 of 63   Document 13-27

68-35

He's participated in the batterer's

intervention program, participated in the fatherhood

initiative program.  He also served as a facilitator

at the ALMA Center, working with other individuals

who were involved in the programing.

                    I think those are to his credit.  I

think that the Court can look at the nature of the

convictions and say that may be good stuff, but it

wasn't directly related to the programming that he

did; or worse, that he took to heart a portion of

the programming, but didn't fully invest himself in

the programming.

                    As to the nature of the contacts, and

there were appreciable contacts between the parties,

a number of them revolved around the parties'

children.

                    Mr. Egerson has been, while confined,

unable to have communication with them, has sought

to have communication with them, has sought

information about what is going on in their lives,

and I can understand that that violates the VODAI

order that was imposed, the no-contact order from

that.

                    I just think it's significant that

the great bulk of the contacts between the parties

```
 1          were not physical abuse, and I don't believe

 2          emotional abuse.

 3                       I think the great bulk of the

 4          contacts were all around sharing of information and

 5          the sharing of the children.  I do think there were

 6          contacts that as the jury found on some of the

 7          letters, they found some of the letter to be

 8          indicative of domestic violence because of what they

 9          perceive to be threats from some of the letters.

10                       And whether those letters were

11          generated by Mr. Egerson, whether those letters were

12          generated by a cell mate, whether he had any input

13          in his cell mate sending them out, the jury has

14          found that he's culpable for those, and we stand in

15          front of the Court accepting that.

16                       Mr. Egerson has lost his oldest son

17          to a heart attack while, actually since the trial in

18          this case.  Mr. Egerson's mother is appreciably ill

19          health.  She suffers from cancer at this point.

20                       And one of the things that

21          Mr. Egerson is very concerned with is that his hope

22          is that he is able to be released from custody

23          before he loses his mother and before his children

24          age so significantly that it will be difficult for

25          him to establish a relationship with them.
```

37

1  I know that the district attorney has

2  asked that there be some restriction on

3  communication between Mr. Egerson and his former

4  wife, Ms. Egerson, by the Court ordering no-contact

5  while he's in his initial confinement.

6  And I expect that to occur, and

7  Mr. Egerson expects that to occur. What Mr. Egerson

8  hopes is that there is a method by which there could

9  be communication and contact between himself and his

10  children.

11  I think it would be to the benefit of

12  Mr. Egerson and to the benefit of the children. And

13  there could be the ability to have third-party

14  contact with the children which could be supervised

15  and monitored by anyone that Ms. Egerson would want

16  to do that.

17  I don't think that the children

18  are -- The children are not viewed as the victims in

19  these offenses. The children, I think, suffer from

20  the nature of the relationship between the Egersons,

21  between contact on the part of Mr. Egerson, but it

22  wasn't directed at them.

23  I believe that that could be

24  rehabilitated, the relationship between the children

25  and Mr. Egerson could be rehabilitated to allow that

38

```
1    contact with them.

2              I think that's something significant

3    that the Court could see being done, whether it be

4    during his confinement, which I hope we would be

5    able to do, or at least during the period of his

6    extended supervision.

7              Mr. Egerson provided me today with a

8    form from the Department of Corrections which

9    indicates the physical problems that he has.  The

10   most significant of which is chronic kidney disease,

11   and he suffers from hypocalcemia.  I think that he

12   presents himself before the Court as not being in

13   the best of health.

14             I would be asking the Court in

15   crafting a sentence to do the following:

16             I would ask the Court to view that

17   this is not crimes of physical violence.  These are

18   crimes that while committed by Mr. Egerson didn't

19   occur in a vacuum from no contact between Mr. and

20   Mrs. Egerson;

21             That Mr. Egerson is serving a lengthy

22   sentence now that won't expire until I believe it to

23   be November, but Mr. Heitman checked, and it looks

24   like it may expire in May of 2019.

25             I believe that in crafting a sentence
```

39

1    that will make it concurrent to the existing

2    sentence is not inappropriate.

3              I believe, and I've told Mr. Egerson,

4    that I would expect that the Court would extend

5    Mr. Egerson's initial confinement in crafting a

6    sentence that was concurrent as to what he's serving

7    at that time.

8              I would ask that the Court follow the

9    recommendation of Mr. Heitman as to the VODAI counts

10   being concurrent to his existing sentence.

11             But I would ask the Court not to do

12   each of the VODAI counts consecutive.  I would ask

13   the Court to consider that the jury did not find a

14   domestic abuse in two of the contacts, and I would

15   therefore ask that the Court make the other contacts

16   while consecutive as to each other, concurrent to

17   the two VODAIs that are not DV related, that were,

18   in effect, non-threatening communications between

19   the Egersons.

20             As to the stalking, it is my belief

21   that the events set forth in the stalking

22   appreciably predate the events of the VODAIs.  I do

23   think the stalking represents a bit of piling on in

24   this instance.

25             The district attorney issued it, and

40

```
 1        the jury determined that Mr. Egerson was guilty of

 2        it, but we're talking conduct that predates the

 3        VODAIs.  We're talking about conduct that predates

 4        his, for the most part, predates his last series of

 5        offenses that he's serving a sentence on.

 6                    I would ask that the Court not make

 7        the sentence that it imposes in the VODAI -- I'm

 8        sorry -- in the stalking consecutive to the existing

 9        sentence, but make it concurrent.

10                    In making it concurrent, I would ask

11        the Court to consider the length of time that has

12        been asked by the district attorney four years and

13        make that sentence a four-year concurrent sentence

14        which would add on a period of additional time to

15        the sentence, but I don't believe that this calls

16        for an additional four years of confinement beyond

17        the sentence that he's currently serving.

18                    So I'm asking the Court to craft a

19        sentence between the VODAIs and the stalking that

20        would add to the initial confinement period that

21        Mr. Egerson is currently serving an additional

22        twelve-to-eighteen months.

23                    I believe that that's sufficient

24        punishment for the nature of the conduct.  I think

25        Mr. Egerson's rehabilitation is or isn't going to
```

41

```
 1        occur with the length of time being added on to his

 2        current sentence, and I don't think that the

 3        additional time is going to contribute to the

 4        rehabilitative aspect of the sentence.

 5                   As to a deterrent, Mr. Egerson stands

 6        before the Court now being sentenced on violation of

 7        a court order similar in nature to violations that

 8        he has had previously.

 9                   I think Mr. Egerson understands the

10        significant risk that he places himself in, and the

11        significant penalty that he will receive, should he

12        involve himself in like or similar conduct.

13                   So I don't believe in sentencing

14        Mr. Egerson, it's necessary to sentence him to any

15        longer period of initial confinement than I'm

16        recommending.

17                   And as in regards to the community,

18        others in the community who do similar acts, it

19        still a lengthy sentence.  It's still a sentence

20        that I think has a deterrent effect so I don't think

21        it's necessary for the Court to impose anything

22        longer than that.

23                   And as to the protection of

24        Ms. Egerson, there's an initial confinement period

25        that will have to be served on the one sentence.
```

42

```
 1        There's an initial confinement period the Judge,

 2        you, will be imposing on this sentence.

 3                    And then as conditions of extended

 4        supervision that exist in the old sentence and in

 5        this sentence, the Court can restrict any contact

 6        Mr. Egerson has.  I think that serves as a

 7        protection that Ms. Egerson has under any sentencing

 8        the Judge has.

 9                    So I'm asking you to follow my

10        recommendation of crafting a sentence that would not

11        add more than twelve-to-eighteen months of initial

12        confinement.

13                    THE COURT:  Mr. Egerson, is there

14        anything you want to say before I sentence you?  And

15        I do have, as I said before, I have read your

16        letter.

17                    THE DEFENDANT:  Thank you, Your

18        Honor.  Your Honor, I want to, first and foremost,

19        thank the Court for taking the opportunity to go

20        through this jury trial.

21                    I want to apologize.  I learned

22        twenty years ago from a senior judge by the name of

23        Thomas Curran, acceptance of responsibility is key

24        in his eyes.  He passed away some years ago.  He's a

25        federal judge I --
```

43

```
 1                    THE COURT:  I know.

 2                    THE DEFENDANT:  Yeah.  I accept

 3        responsibility for my actions, Your Honor.  I

 4        totally do.

 5                    Throughout this ordeal, my main

 6        purpose was to challenge what was in the restraining

 7        order, the temporary restraining order.  This

 8        temporary restraining order was issued against me

 9        while I was incarcerated at the House of Correction.

10                    During that time while I was in the

11        House of Correction, Ms. Egerson had access.  She

12        was the only one that had access to my home.  She

13        had access to my keys.  She had access to my car,

14        and she drove out to the House of Correction and

15        went into my car, went into my home and, you know,

16        it was just taking possessions out of my home.

17                    And all I wanted to do was just to

18        maintain my home and maintain contact with my kids.

19        During that time, Your Honor, I -- I just wanted to

20        be a father to my kids.

21                    And if I'm guilty of that, I should

22        be punished for trying to be a father.  I don't have

23        any intentions of hurting Alexandra.  Alexandra, I

24        love Alexandra.  She's a great mother.  She's a

25        great person.
```

44

```
 1                        But my goal is fatherhood.  And being

 2        a model to my children is something that I want

 3        always to instill into those children because we

 4        planned those children, two of them at least.  The

 5        other one was unexpected, but the first two we

 6        planned.

 7                        And, more importantly, Your Honor, I

 8        have made some major changes in my life.  Alexandra

 9        used to come pick me up from the batterer's

10        intervention program.

11                        The first case that I called for the

12        bail jumping is because she called police -- the

13        finances was bad.  I moved back home.  She called

14        the police on me because she found out I had hired a

15        private investigator, and I was arrested in the

16        home.  There's no doubt about it.  I was charged

17        with bail jumping.

18                        But it wasn't because I came by the

19        house, being aggressive.  All of this stems from

20        just, it goes one way, and then when she gets mad,

21        it goes another way.

22                        And maybe I should have just stayed

23        away but my kids would always -- I would come home.

24        I worked in Chicago, catch the Hiawatha.  And I see

25        my kids running to me, and Daddy's home.
```

45

1           And then it brings so much joy to me

2     knowing that my kids love me, man, and cherish me

3     because -- Not because of my material or my

4     financial wealth, because of who I am as a father,

5     and my character.

6           That was the most important thing,

7     Your Honor, is making sure that my kids was having a

8     better environment, a better livelihood than I had.

9           Your Honor, I went from the ghetto

10    streets of Milwaukee, selling drugs and committing

11    credit card fraud, to the executive suites of

12    Fortune 1000 companies such as ATT, Career Builders,

13    and Motorola.  And I made some changes.

14          And those companies wouldn't hire me,

15    not just based on me lying to them, people hired me

16    based on my experience, based on my ability to come

17    in there and do a job, based on me being able to

18    come and change culture, be able to teach hiring

19    managers about unbiased hiring, be able to teach

20    resource and development departments about culture

21    and how to diversify.

22          That's a very important thing, Your

23    Honor, is to make change.  And I would like an

24    interstate compact to Georgia.  I have a daughter

25    that was born.

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 46 of 63   Document 13-27

68-46

```
 1                    And I understand that maybe she can
 2          be upset about my other life that was dated from
 3          her, my home that I have in Georgia, and the new
 4          lady that's in my life.  That can be acceptable.
 5                    But my kids, Your Honor, I can never
 6          forgot them.  Because the last time I seen them was
 7          August 14.  They begged Alex to spend the night by
 8          my house.  They begged her.  They said they wanted
 9          to stay with daddy.
10                    And Alex came by, and the last day I
11          seen my kids was that day.  They spent the night
12          with me.  We had a great time, and I haven't seen
13          them since.
14                    So I don't understand what happened
15          in between.  She has sent me I Care packages while I
16          was in the county jail.  She sent me an I Care
17          package on November, and you have that receipt.  It
18          went in, in testimony.
19                    And she wrote me, and all I want to
20          do is just talk to my kids and tell them I love
21          them, Your Honor.  I miss them.
22                    A.J., Michala, are -- were the
23          heartbeat of my soul.  This is not about stalking
24          her.  This is not about trying to find out about her
25          lifestyle, or what's going on with her.  I just want
```

47

```
 1        to be a father to my children, and that's very

 2        important to me.

 3                        And I've seen prison, it's taken

 4        away, men away from their families, and I don't want

 5        to be taken away from my kids based on my

 6        incarceration.

 7                        I still want them to know that daddy

 8        loves them, and daddy still cares.  And daddy is

 9        just away right now.  And I don't have to speak to

10        her.  We do have a third-party contact, and that's a

11        person that's Melanie Melsheimer, who is Alexandra's

12        cousin.

13                        I've tried her hundreds of times to

14        call Mel to speak to my kids.  There has never been

15        a contact made.  Hundreds of times.  There is a

16        third-party contact, and Alexandra has not let me

17        speak to my kids, or Melanie Melsheimer has let me

18        speak herself to my kids.

19                        So, Your Honor, in closing, I

20        understand that I have broken the law.  I understand

21        that when you break the law, you must be punished.

22        I understand that there's consequences behind that.

23                        I am not this person that has any

24        disregard for the law.  I just have been trying to

25        get to the truth and show that the restraining order
```

48

1    has been misleading and false information.

2                    And, more importantly, Alexandra has

3    been coming by my house multiple times, like my

4    cousin and Mr. Robinson has said.

5                    My auntie is here.  My mother is

6    here.  They're old.  My auntie is eight-four years

7    old.  My mother is eighty-one, with cancer.

8                    Right now, my release date is 2019.

9    I have an interstate compact.  I have a home.  I'm

10   relocating to another area of the country.  And all

11   I want to do is still maintain my fatherhood and be

12   a motivating force in my children's life.

13                   But in closing, Your Honor, the only

14   thing I want to do, Your Honor, is I want to get out

15   and, you know, get my mother a Ellie and Farmer's

16   apple pie, pick her up some fried catfish.  I want

17   to play dominos with my aunties, and I just want to

18   go home, Your Honor, and listen to some Tom Petty

19   and, you know, take a hot bath.

20                   This has been -- I haven't been

21   convicted of a felony in twenty years.  I have eight

22   felony convictions now.  Eight felony convictions

23   since I've been incarcerated.

24                   All of these crimes happened since

25   I've been incarcerated.  All of these charges has

49

```
 1      been since I've been incarcerated.  I haven't --
 2      These charges are not me being on the streets.
 3      These charges is me being incarcerated, Your Honor.
 4                      And I apologize to Alexandra if
 5      there's any fear in her.  I don't mean to do her no
 6      harm.  I plan on moving on with my life.  I plan on
 7      re-marrying and taking care of my daughter and
 8      taking care of my children.
 9                      And that's the gist of what's been
10      going on is me trying to be a father in those
11      children's lives.  And if that's a problem, then I
12      don't know what else to say, and I don't know what
13      else to do.
14                      But I apologize to the Court, I
15      apologize to Mr. Heitman, and I apologize to any
16      other person that has been -- needs me to apologize
17      to at this time.
18                      THE COURT:  So you started out saying
19      you talked about taking responsibility for your
20      actions and your reference to Judge Curran, so I
21      have got to ask you, the letters, who wrote those?
22                      THE DEFENDANT:  I wrote -- I wrote
23      the first letter, Your Honor, and I had some
24      influence on the other letters as well too.
25                      THE COURT:  What does that mean, "you
```

50

had some influence"?

THE DEFENDANT: When the letters would come in, when she write back, my cell partner told me that he would write her. And I said I don't care what you write, just make sure you don't put anything in there threatening.

THE COURT: That's your idea of taking responsibility?

THE DEFENDANT: Well, my idea of taking responsibility is that I should never have had any contact. I should never have had any influence or any writing at all to her.

Once these -- Once the first letter came --

THE COURT: I'm talking about the second letters. The ones you claim your -- The ones you got on the stand, under oath, and told the jury that you had nothing to do with writing those letters, that they were done just totally by your cell mate without any input from you.

And now you're telling me that, well, maybe you had a little influence on it. This is your idea of taking responsibility; is that what you're telling me?

THE DEFENDANT: My idea of taking

51

```
 1          responsibility is that I should have never had him

 2          write those letters.  I should have -- I should

 3          never let him write those letters.

 4                          THE COURT:  Well, which is it:  You

 5          should never have let him write the letters, or you

 6          should never have had him write the letters?

 7                          It's two different things.  One is,

 8          you know, somebody says, well, I'm going to write a

 9          letter, and you say, okay, just don't put anything

10          threatening in there.

11                          The other is:  Hey, I want you to

12          write a letter to Alexandra because I can't.  So

13          which is it?

14                          THE DEFENDANT:  It's the -- It's the

15          second part that I should never have let him write

16          those letters, Your Honor.

17                          THE COURT:  That's your idea -- Now

18          I'm back to my first question.  That's your idea of

19          taking responsibility.  You still want this Court to

20          believe that you didn't write those letters?

21                          THE DEFENDANT:  I should have never

22          had any influence on him writing those letters, the

23          first one, the first -- the first one, Your Honor,

24          the first one, not the second one.

25                          THE COURT:  Mr. Egerson, you are a
```

52

master manipulator. You are the classic domestic

violence perpetrator. Textbooks describe people

just like you.

You have done nothing for the last,

however long you have know Alexandra, but manipulate

her and try to control her, and the way she runs her

life.

The fact that you could pick up all

of these charges and convictions while you're in

custody, you put that out there like that's a good

thing, like that's a mitigating thing.

To me, that's one of the more

aggravating things about this. I shudder to think

what would have happened if you were out on the

street, and she was trying to break away from you.

I have to say that I have not seen in

forty years of experience as a lawyer and

twenty-three of that as a judge, I have not seen or

heard a victim as eloquent and as articulate in

being able to explain her actions, and why she did

the things she did, as Alexandra was in this

courtroom when she testified in at trial and when

she spoke here today. That was amazing to me that

she would have the strength to do that.

You, on the other hand, have done

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 53 of 63   Document 13-27

68-53

```
 1        nothing but for years trying to control her, whether
 2        it was while you were on the street or from jail or
 3        prison.
 4                       You were still doing it when you came
 5        here for trial.  You made a phone call to try and
 6        get her not to come to court.
 7                       And you will sit there and try to
 8        tell me how you want to take responsibility for
 9        things?  No, Mr. Egerson.  You have exercised a
10        pattern, or engaged in a pattern, over a number of
11        years of trying to control her, and you want to tell
12        me that all you care about is your children.
13                       I don't think so.  If you cared about
14        your children, the well-being of your children,
15        knowing that you're in custody, the person who's
16        taking care of your children that you claim you care
17        so much about is Alexandra, and you did nothing but
18        make her life hell on Earth.
19                       And I will concede, as she did, that
20        there were some really good times, but that's all
21        part of the cycle of manipulation that people like
22        you engage in when they seek to control someone in a
23        relationship.
24                       Sure, they're very generous, and
25        magnanimous, and all of that to whatever level they
```

can.  You know, your success and life on the street

is a two-edged sword, Mr. Egerson.  It's quite

impressive what you've done.

But you had the ability, clearly had

the ability, and yet you threw it all away, in terms

of the way you treated Alexandra.  I mean, it's

just, you know, again, I don't think I've seen

anybody quite like you in all the years I've been on

the bench in terms of trying to control somebody

else through manipulation.

I don't for a minute believe you

didn't write those letters.  I think you have a lot

more involvement than just not stopping the person

from writing them.

And, yes, there were no physical

acts, as your lawyer pointed out.  And Mr. Rosenthal

has done as good a job for you as I think anybody

could have done in terms of arguing for a sentence

on your behalf.

I look at the three things the Court

has to consider:  Your background, you have

twenty-eight convictions.  If I went out on the

street right now and stopped ten people and said:

Hey, I've got somebody in front of me this afternoon

on six charges.

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 55 of 63   Document 13-27

68-55

```
1                    He's got twenty-two, twenty-two prior

2       convictions -- And that's not even counting what

3       happened in federal court, I truly am not counting

4       them -- they've got twenty-two state convictions

5       prior to today, what do you think I should do with

6       them?

7                    And I would be amazed if not every

8       single one of ten said what are you talking about,

9       Judge?  What's the maximum?

10                   I mean, how many times do we have to,

11      we, as a community, have to keep letting this back

12      in the community to prey on somebody, in this case

13      Alexandra, how many times?

14                   You say you aren't going to hurt her.

15      You are hurting her mentally and emotionally, and

16      you've been doing that for years.

17                   And your statement about learning

18      from Judge Curran about taking responsibility, I

19      don't think you've learned that, Mr. Egerson.

20                   I don't really think you've learned

21      to take responsible because if you did, you wouldn't

22      have been treating her this way for all these years.

23      I mean, it's just -- I don't know.

24                   So twenty-eight, now twenty-eight

25      convictions, I don't know that I've seen somebody
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 56 of 63   Document 13-27

68-56

1          with more than twenty-eight convictions in my time
    2          on the bench.  If I have, I can count them on one
    3          hand.
    4                          I think that these children
    5          deserve -- that you claim you care so much
    6          about -- if you truly cared about them so much, you
    7          would not be asking me to do what you're asking.
    8                          You would acknowledge the fact that
    9          what they need is a stable house where their
   10          caretaker mother, a person who they look to for love
   11          and support and concern is not so stressed out that
   12          she can't function, is not so stressed out that she
   13          can't meet their emotional needs.
   14                          And yet she came in here today and
   15          said that -- like all mothers and good fathers do,
   16          they put their kids first -- and so she's despite
   17          the fact that she has PTSD and is struggling with
   18          what you've done to her, and the hyper-vigilance
   19          she's had to live with for all of this time, she has
   20          put her kids first.
   21                          What that means is she is putting
   22          herself second -- Well, actually fourth, after the
   23          three kids -- at great harm to herself.
   24                          And I don't know how long she can
   25          maintain that, especially in the face of the

                                      57

1       possibility or the fear that you will start

2       contacting her again and causing through your

3       contact with them more harm to her.

4                       So I think absolutely I not only have

5       the right and the authority to restrict your contact

6       with them, I have the moral and legal obligation to

7       do that to give Ms. Egerson the peace that she so

8       strongly deserves, and the ability to rest her head

9       easily at night and know that she only has to focus

10      on taking care of herself and her children and not

11      to worry about contact from you.

12                      The seriousness of these offenses,

13      they are deceptively serious.  And what I mean by

14      that is you're attorney is quite right, there aren't

15      any physical beatings in these charges.  There's no

16      physical harm.  But how could there be, you were in

17      custody.

18                      But the psychic damage was, in the

19      words of Ms. Egerson, fair worse than the physical

20      injuries, and that is absolutely the case.

21                      So the fact that there were no

22      physical injuries here is really, as I said,

23      deceptively serious and dangerous, and nobody should

24      have to put up with that.

25                      The message to the community, what's

                                    58

```
1        most egregious about all of this in terms of the
2        message to the community and the message to you, is
3        that all of these, with the exception of the
4        stalking offense, involved you violating a court
5        order, and not a court order you didn't understand.
6                    This is not the first time you were
7        charged with and convicted of violating a domestic
8        abuse injunction.  You knew full well that even if
9        she was standing at your door, knocking at the door
10       every time, asking to see you, begging to see you,
11       even if that were the case, you knew full well that
12       you were not supposed to be doing that.
13                    And to the extent that she was doing
14       that, that was just another example of the
15       manipulation that you carried out on her to make her
16       feel like she had to do that in a desperate hope, I
17       guess, that things would only get better and stay
18       better.  But, of course, they didn't.
19                    And I -- Not one minute for the
20       sentence I'm going to impose, is connected to the
21       comments of the two people who spoke on your behalf.
22                    But I can't help but noticing that
23       their comments were really pretty victim blaming in
24       terms of how these things happened, and she was
25       always over there, and you know, why would she want
```

59

```
 1    to deny her kids the ability of the kids to see
 2    their father.
 3                  And I get that.  I'm not criticizing
 4    them.  You know, they're just sticking up for their
 5    friend or their cousin.  I understand that on that
 6    level, but I think they need to understand.
 7                  What would be most helpful,
 8    Mr. Egerson, if you had a conversation with them and
 9    said no, this is not on Alexandra, not one bit of
10    this is on her.  This is all on me, Terrance
11    Egerson.
12                  That's what I didn't hear, and that's
13    why I don't think there has truly been an acceptance
14    of responsibility as you framed it when you first
15    started speaking.
16                  For all of those reasons, I'm going
17    to impose the following sentences:
18                  On Counts One and Three, I am
19    imposing sentences of one year of initial
20    confinement and one year of extended supervision.
21                  Those sentences are consecutive to
22    each other, but concurrent with the sentence you are
23    currently serving.
24                  On Counts Four, Five, and Six, I am
25    imposing sentences of four years, two years of
```

60

1    initial confinement and two years of extended

2    supervision.

3                    Each count to run consecutive to each

4    other and Counts One and Three, but also concurrent

5    with the time on the sentence that you are currently

6    serving.

7                    On Count Two, the stalking charge,

8    I'm going to impose sentences of four years of

9    initial confinement and three year of extended

10   supervision.

11                   That sentence to run consecutive to

12   all other sentences.

13                   Is there credit here on the first, on

14   Counts One, Four, Five and Six?

15                   MR. ROSENTHAL:  415 days.

16                   THE COURT:  That's from March 9 --

17                   MR. ROSENTHAL:  March 9, 2015.

18                   THE COURT:  Four hundred and what?

19                   MR. ROSENTHAL:  Fifteen.

20                   THE COURT:  Thank you.  415 days

21   credit.  Based on the nature of these offenses,

22   especially the stalking offense, I'm going to find

23   you're not eligible for the Challenge Incarceration

24   Program or the Substance Abuse Program.

25                   You have been convicted of felonies;

                              61

```
1         therefore, it's illegal for you to possess a firearm

2         under any circumstances.

3                     I am going to, given the length of

4         these sentences, impose the domestic violence

5         surcharges on Counts Two, Four, Five, and Six, but

6         I'm going to waive the payment of those given the

7         length of the sentences.

8                     I'm also waiving payment of any costs

9         and surcharges in these cases, again, because of the

10        length of the sentences.

11                    You are ordered to provide a DNA

12        sample which I assume you've already done.

13                    Anything else?

14                    Oh, I'm going to order that there is

15        to be no contact with Ms. Egerson or her three

16        children during the pendency of these sentences.

17                    Anything else, Mr. Heitman?

18                    MR. HEITMAN:  No, Judge.  Thank you.

19                    THE COURT:  Mr. Rosenthal?

20                    MR. ROSENTHAL:  No, Your Honor.

21                    THE COURT:  That's all.  Good luck,

22        sir.

23                    (Whereupon, the proceedings were

24        concluded at 4:56 o'clock in the afternoon.)

25
```

```
 1

 2

 3        STATE OF WISCONSIN)
                          )     ss.
 4        MILWAUKEE COUNTY  )

 5
                  I, William J. Carpenter, do hereby
 6
          certify that I am a court reporter for the circuit
 7
          court of Milwaukee County, that as such I recorded
 8
          the foregoing proceedings, later transcribed by me,
 9
          and that it is true and correct to the best of my
10
          abilities.
11

12
                  Dated this 7th day of June, 2016, at
13
          Milwaukee, Wisconsin.
14

15

16
                  William J. Carpenter
17                Court Reporter

18

19

20

21

22

23

24

25
```

Case 2:19-cv-00200-WCG   Filed 05/29/19   Page 63 of 63   Document 13-27

68-63